2016 Ark. App. 299

**Tiffany WAFFORD and Freddie Miles, Appellants**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES, Appellee**

**No. CV–15–932**

Court of Appeals of Arkansas, Division IV.

Opinion Delivered June 1, 2016

Tina Bowers Lee, Arkansas Public Defender Commission, for appellant.

Jerald A. Sharum, Office of Chief Counsel, for appellee.

Chrestman Group, PLLC, by: Keith L. Chrestman, attorney ad litem for minor children.

## M. MICHAEL KINARD, Judge

Appellants Tiffany Wafford and Freddie Miles appeal the termination of their parental rights to their three children, DJM, DM, and TM. They have filed separate briefs on appeal challenging the trial court's findings that termination was in the children's best interest and that statutory grounds for termination were proved. We affirm.

The Department of Human Services (DHS) took custody of the children at different times, and the cases initially proceeded separately. TM was taken into custody after she was born on September 10, 2013, with drugs in her system. Wafford tested positive for amphetamines and barbiturates but denied drug use. Wafford was then incarcerated on a probation violation on September 18. DM, born August 30, 2012, was removed from Miles's custody on September 23, 2013. Miles refused to take a drug test and acknowledged that he had stopped taking medication for his mental-health diagnosis. There was also evidence of medical neglect. DM had been diagnosed with "failure to thrive" but had not returned to the doctor since he was eleven weeks old, had not received immunizations since he was two months old, and had an untreated ear infection. DJM, born March 26, 2008, had been placed in the custody of Wafford's mother, Belinda Brown, since 2009. DJM was removed from Brown's custody in April 2014 after Brown failed drug tests and refused to cooperate with DHS in a protective-services case. All three children were adjudicated dependent-neglected.

According to Wafford, she violated her probation for fraudulent use of a credit card by failing to report and make payments as ordered, and she was sentenced to three years' imprisonment. After her arrest in September 2013, she remained incarcerated until September 2014. Miles submitted to a psychological evaluation but otherwise failed to comply with the case plan while Wafford was incarcerated. After an initial mental-health evaluation, Miles was diagnosed with major depressive disorder, recurrent, in partial remission, and it was recommended that he undergo a psychiatric evaluation. At a December 2013 psychological evaluation, Miles reported that he was uncertain of his mental diagnosis for which he received disability benefits. He also reported a history of numerous drug and domestic-violence charges. This evaluation resulted in a diagnosis of personality disorder with passive/aggressive, dependent, and schizoid features. The examiner stated in his report that it was difficult to see how Miles could be an adequate caregiver without

intensive psychotherapy, and this would have to be in conjunction with maintaining sobriety.

At an August 2014 permanency-planning hearing, Wafford testified that she would soon be released from prison to a halfway house. The trial court authorized a plan for custody of DM and TM to be placed with Wafford after her release from the halfway house. The court ordered her to obtain safe and appropriate housing and to obtain employment. Miles was still not in compliance with the case plan.

The anticipated reunification with Wafford did not occur. Wafford left the halfway house early, married Miles on October 1, 2014, and began living with Miles. A DHS court report dated October 31, 2014, noted that Wafford's case plan ordered her to establish independent living arrangements separate from Miles. At the November 5, 2014 review hearings, the court found that Wafford had failed to obtain a residence separate from Miles, had not provided proof of employment, and had missed her appointment for a psychological evaluation. The court ordered her to do these things and to complete counseling if recommended. Miles tested positive for methamphetamine twice in October and still failed to attend counseling. The court found that although she was currently clean, Wafford was jeopardizing her sobriety by living with Miles. DHS filed a petition to terminate the parties' rights to DM and TM in November 2014; the petition for termination of their rights to DJM was filed in February 2015.

At the termination hearing, Wafford testified that she had used methamphetamine since she was "a kid" but claimed she had not used any drugs since her release from prison. Wafford had tested positive once since her release, but she disputed the results, claiming that she had never used cocaine and that she had tested negative for her parole officer. Byron Woods, a DHS family service worker, testified that Wafford did not complete any programs at the halfway house. She did, however, complete outpatient drug counseling and aftercare in March 2015. Wafford admitted that she had not been to NA meetings in a while, but she intended to go again.

Wafford acknowledged that, like TM, DJM was born with drugs in her system and a case had been opened in California where they were living. Wafford said that she gave DJM to Brown when the child was nine months old because she was in trouble regarding probation in California and at one point served a nine-month sentence there. Wafford acknowledged that she never completed parenting classes or a psychological evaluation but claimed they had not been rescheduled by DHS. She said that she had made some job applications but had not been employed since being paroled. She planned to seek disability benefits for her asthma condition, which had caused several hospitalizations. She did not have a driver's license or a vehicle. Woods agreed with Wafford that the home the parties were living in was suitable.

Woods testified that Miles's compliance was highly sporadic for more than a year. He had numerous positive drug tests and often evaded testing. Miles testified that he had used methamphetamine for ten or fifteen years but he had refused to enter drug treatment because he did not like the therapist and would not have been allowed to continue taking prescription pain medication for a knee condition. However, Miles said that he had attended aftercare and NA meetings with Wafford and was no longer using drugs. His last positive test was on October 31, 2014.

Miles received disability benefits for mental disabilities and testified that he went to a mental-health clinic for medi-

cation management. He claimed that he did not need counseling. He never took parenting classes and failed to consistently visit the children while Wafford was incarcerated. He was on probation for forgery and had an upcoming probation-revocation hearing due to nonpayment. He admitted that there had been domestic violence between him and Wafford, but he claimed that the last instance had occurred about two years earlier.

The termination of parental rights is a two-step process. The trial court must find by clear and convincing evidence (1) the existence of one or more statutory grounds for termination and (2) that termination is in the best interest of the children. *Chaffin v. Arkansas Department of Human Services*, 2015 Ark. App. 522, 471 S.W.3d 251. On appeal, sufficiency of the evidence is determined by whether the trial court's finding that the fact was proved by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when the appellate court is, on the entire evidence, left with a definite and firm conviction that a mistake has been made. *Id.* In deciding whether a finding of the trial court is clearly erroneous, we give great deference to the superior opportunity of the trial court to observe the parties and to judge the credibility of witnesses. *Id.*

Wafford contends that the evidence is insufficient to support any of the three statutory grounds for termination found by the trial court. Only one ground is necessary to terminate parental rights. *Friend v. Arkansas Department of Human Services*, 2009 Ark.App. 606, 344 S.W.3d 670. We affirm on the "subsequent factors" ground. This ground is proved when other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent. Ark.Code Ann. § 9–27–341(b)(3)(B)(vii)(*a*) (Repl. 2015).

Wafford argues that her marriage to Miles was not a subsequent factor warranting termination. She notes that she was not ordered to stay away from Miles and that his compliance with the case plan improved after their marriage. She further argues that although she left the halfway house, her drug counselor's report proved that her participation in intensive outpatient rehab was a viable option.

Subsequent to the filing of the petition in TM's and DM's cases, Wafford was sentenced to the Department of Correction for violating her probation. She was incarcerated for approximately one year. When Wafford was finally released from prison and could begin fully participating in the case plan, she did not comply. She left the halfway house early instead of continuing with the recommended drug treatment. Although Wafford was not ordered to have no contact with Miles, she was ordered to have a separate residence in the case plan and court orders. Miles had completely failed to comply with the case plan while Wafford was incarcerated, and he continued to test positive for drugs even after her release and their marriage. Although he eventually began testing negative on drug tests, he still had not submitted to treatment or addressed his mental-health issues. The requirement for a separate residence was viewed as necessary for Wafford's sobriety and ability to provide a stable home for the children. Her failure to obtain employment

and complete the psychological evaluation and any recommendations left further doubt about her ability to provide for the children. We hold that the trial court's finding was not clearly erroneous.

■■■ The best-interest analysis includes consideration of the likelihood that the children will be adopted and of the potential harm caused by returning custody of the children to the parent. Ark. Code Ann. § 9–27–341(b)(3)(A). However, adoptability[1] and potential harm are merely factors to be considered—they are not elements of the cause of action and need not be established by clear and convincing evidence. *See Chaffin, supra.* Rather, after considering all of the factors, the trial court must find by clear and convincing evidence that termination of parental rights is in the best interest of the children. *Id.*

■■■ Wafford argues that the trial court erroneously found that her marriage and living arrangements would result in potential harm because there was insufficient evidence that she was likely to relapse or that the children would otherwise be subjected to harm. We cannot say that the trial court's best-interest finding was clearly erroneous. Despite the court's orders and the fact that the case was moving toward termination, Wafford did not obtain separate living arrangements. Both parents admitted to being long-time drug abusers, and Miles did not submit to drug treatment. Two of their children were born with drugs in their systems, and the other child was medically neglected in his first year of life. Neither parent completed parenting classes or counseling, Wafford had no income, and Miles was facing incarceration. A parent's lack of stable housing or employment can demonstrate potential harm to a child, as can a parent's continued illegal-drug usage. *Jung v. Arkansas Department of Human Services,* 2014 Ark. App. 523, 443 S.W.3d 555 (holding that while there was some evidence that Jung was recently employed and sober at the time of the hearing, there was insufficient proof that, given her history, she could maintain employment or sobriety).

Miles also challenges each of the grounds for termination. He contends that although he did not comply with all of DHS's orders, he had remedied all subsequent issues and reached the desired outcome. We disagree. As DHS notes, he made no overtures toward compliance for a year and still tested positive for drugs after Wafford had been released and was living with him. A psychological evaluation recommended that Miles receive intensive psychotherapy and a drug assessment recommended treatment, but Miles submitted to neither. He also failed to consistently visit the children, failed to complete parenting classes, and was facing a probation-revocation hearing. The finding of the "subsequent factors" ground was not clearly erroneous.

■■■ Miles contends that the best-interest finding was erroneous because the children could have been returned to an appropriate, drug-free home at the time of the termination hearing. Again, we disagree. It is well established that evidence that a parent begins to make improvement as termination becomes more imminent will not outweigh other evidence demonstrating a failure to comply and to remedy the situation that caused the children to be removed in the first place. *McPherson v. Arkansas Department of Human Services,* 2013 Ark. App. 525, 2013 WL 5371937.

1. An adoption specialist testified at the termination hearing that the children were adoptable, and neither parent challenges the evidence on this factor.

Miles did not begin to address any of the issues preventing reunification until more than a year into the case, and as noted above, significant issues remained. We affirm the trial court's decision.

Affirmed.

Gladwin, C.J., and Gruber, J., agree.